UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> KEVIN C. CAMPBELL, <br><br> Defendant. | NO. CR17-025JCC <br><br> **UNITED STATES' SENTENCING MEMORANDUM** <br><br> Sentencing Date: August 8, 2017 |

The United States of America, by and through Annette L. Hayes, United States Attorney for the Western District of Washington, and Steven T. Masada, Assistant United States Attorney for said District, files this Memorandum in anticipation of the sentencing hearing in the aforementioned matter. A Table of Exhibits is appended below for the Court's convenience.[1] Sentencing is scheduled for August 8, 2017.

## I.     INTRODUCTION

The defendant, Kevin C. Campbell, comes before the Court for sentencing on his guilty plea to *Distribution of Controlled Substances*, in violation of Title 21, United States Code, Sections 841(a). For the reasons set forth below, the United States respectfully

---

[1] A courtesy copy of the United States' sentencing material will be provided to the Court.

United States' Sentencing Memorandum - 1
*U.S. v. Campbell*, CR17-025JCC

recommends that the Court impose a sentence of **96 months** in custody, to be followed by three years of supervised release. The U.S. Probation Office recommends a sentence of 72 months.

On August 29, 2013, Kevin Campbell, an active drug vendor on the notorious underground website Silk Road, sent a private message to one of his many customers, Jordan M., about the "white china" heroin delivered earlier that day:

> **Date:** 2013-08-29 12:29:00  **From:** PTandRnR  **To:** d0xic
> **Subject:** I hope that all is ok
> **Message:** I was just able to see that your pkg has been delivered to you and was curious as to the review- should I be grabbing more of that?-
> ok well cheers
> enjoy

Jordan M., however, never read that message. At about noon, he received the mail package he had been expecting from Chicago, Illinois. Jordan M. immediately opened the parcel and injected roughly .3 grams (g) of the heroin concealed inside. He lost consciousness and his breathing slowed. A few hours later, after he failed to show up at work at nearby Microsoft, a houseguest found Jordan M.'s seemingly lifeless, blue-colored body slumped over in front of his computer desk in his bedroom. On the floor still lay a used needle and a belt looped into a tourniquet. On the desk before him lay a still-open baggie of heroin, a cooking spoon and lighter, and other drug paraphernalia. Also on the desk was Jordan M.'s computer, logged into the Silk Road website, with the above-unread message from Kevin Campbell.

Jordan M. never regained consciousness, despite the best efforts of first-responders, physicians, and other medical personnel. He had no brain activity due to complete respiratory failure. A few days later, his family was forced into the unthinkable decision to terminate life support. Jordan M. died from an overdose. He was 27 years old.

As a tireless investigation later uncovered, Campbell was an active and somewhat savvy drug distributor operating on the Dark Web. Multiple prior drug convictions had not deterred him. Even after the demise of Silk Road, Campbell continued to sell drugs to customers across the nation until he was finally arrested. He engaged in this harmful

United States' Sentencing Memorandum - 2
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

conduct, to the severe detriment of this community and the families of countless addicts, out of simple greed.   A custodial sentence of some significance is warranted.

## II.   BACKGROUND

### A.   Offense Conduct

The revised Presentence Report ("PSR") prepared by the Probation Office, dated July 25, 2017, and the parties' Plea Agreement (Dkt. #9), provide an accurate overview of the offense conduct of the defendant, Kevin Campbell, and the tragic consequences.  PSR ¶¶ 8-20.  In short, Campbell, using the online moniker "PTandRnR," actively marketed, sold, and distributed various drugs across the United States, to include Western Washington, and abroad on the notorious underground Silk Road website.[2]  Even after Silk Road was shuttered by law enforcement in about October 2013, Campbell continued to sell and distribute narcotics, including through the use of the U.S. Mail.  Meanwhile, by all appearances, he worked as, or at minimum held himself out as, a substance abuse counselor. A copy of Campbell's LinkedIn profile is attached as **Exhibit 1**.[3]

The investigation began with the overdose death of Jordan M., a young Bellevue resident and tech worker.  Through an intense and dedicated investigation, investigators identified "PTandRnR," the active Silk Road vendor who had provided Jordan M. with that lethal dose, as Kevin Campbell, a resident of Chicago, Illinois.

### 1.   Silk Road

Silk Road was essentially an online marketplace existing solely in the deep reaches of the Internet, often referred to as the Dark Web.  During its existence, Silk Road served as the pre-eminent underground black market where narcotics, among other things, have been regularly bought and sold by the site's users on an anonymous basis.  More specifically, Silk Road provided a platform for individuals around the United States and around the world to advertise, sell, purchase, distribute and receive a wide variety of illicit goods and

---

[2] Campbell, for instance, shipped to customers in Australia, Israel, and Canada.  *E.g.,* Exhibit 3 at 001191, 1193, 1410.
[3] Campbell now claims that he was not in fact a substance abuse counselor, but rather was merely misrepresenting himself as such.

United States' Sentencing Memorandum - 3
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

services, including but not limited to drugs, fake IDs and passports, computer-hacking tools and services, counterfeit goods and pirated media, criminal guidebooks and instruction manuals, and money laundering services. Hosted on the Tor-network, Silk Road further promoted and facilitated the creation of ostensibly untraceable IP addresses for users' computers and the laundering of proceeds from illegal transactions through the use of a payment system based in "Bitcoins," an anonymous form of digital currency.

The Federal Bureau of Investigation (FBI) led an independent investigation of Silk Road and its creator and owner/operator, Ross Ulbrecht, a.k.a., "Dread Pirate Roberts." On or about October 1, 2013, law enforcement shut down Silk Road. As part of its independent investigation, the FBI seized and/or searched servers used by the Silk Road network and obtained data from other domestic and foreign sources.

Ulbrecht, the mastermind and operator of Silk Road, was federally prosecuted in the Southern District of New York, *United States v. Ulbrecht*, CR14-68KBF (S.D.N.Y.). He was convicted at trial and sentenced to *life* in prison. Notably, Jordan M.'s overdose death was highlighted in the United States' sentencing material. *Ulbrecht*, Dkt. #256.

### 2. *Campbell's Distribution on Silk Road*

Kevin Campbell, a.k.a., "PTandRnR," illegally marketed, sold, and disseminated various drugs over Silk Road and maintained a slick vendor page listing various drugs readily available for sale and touting his experience and sophistication in drug sales. A copy of Campbell's Silk Road vendor site is attached as **Exhibit 2**. For instance, Campbell's vendor page contained the following promotional message:

> Welcome
> Thank you for stopping by...
>
> We are new to vending on Silk Road but certainly not new to the game. We are very excited at the opportunity to establish a new customer base on SR. Our aim is to provide valued customers with great prices and great products. To ensure your satisfaction will be our #1 priority.
>
> If you like our store and the way we operate - Please join our fan base!

United States' Sentencing Memorandum - 4
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*Id.*  Campbell, according to his vendor page, had 69 "fans" and boasted a 100% positive feedback rating, having fulfilled 161 drug orders on Silk Road.[4]  Campbell also stated that he shipped with the U.S. Postal Service (USPS) and used several stealth techniques to avoid detection by law enforcement.  Above all, Campbell promoted his quick and reliable service:

> To conclude, our goal isn't to just sell you a product at a good price but to make you a long term friend by building a relationship with you. You want to know that what you're buying is what you're buying and not some hot garbage and we understand that. We know that when you make a purchase you don't want to wait 10 days to get it - neither do we. We have a firm understanding that you want your product fast...almost as fast as when you purchased it and that's why we aim to treat everyone the way that we want to be treated.
>
> Until we do business... have a look around, ask questions (no question is a dumb question), we're looking forward to dealing with you and we thank you in advance for your honorable business.
>
> Sent with the best of our regards,
> PT and RnR

*Id.* at 2.  Indeed, Campbell attempted to employ business standards and practices to his drug distribution, placing heavy emphasis on client development, customer service, and customer reviews.

Campbell actively and aggressively solicited customers through special offers and direct messaging.  Copies of Campbell's direct message communications over Silk Road, organized by party, is file *under seal* as **Exhibit 3**.  For instance, in July, Campbell solicited another drug customer "applecatjuices," alluding to various potentially available narcotics:

> **Date:** 2013-07-30 05:10:49     **From:** PTandRnR          **To:** applecatjuices
> **Subject:** Honesty & Your Word
>       ...
> So what is it you would like to see on our page- what are you into (bud, coke, heroin, roids or scripts)? let us know and we will see what we can do for you
> Thanks again for your interest in our products
> We hope to see you soon
> PT
> PS: let us know how that works out for you

Exhibit 3 at 001187-88.  Campbell also frequently offered free samples and extra drugs to prospective clients in the hope of attracting and locking up new customer relationships and

---

[4] Based on his direct messages, it is apparent that Campbell was active on Silk Road by at least February 2013. Moreover, although he stated that he only shipped domestically, Campbell sold and sent drugs to customers in other countries, to include Australia, Israel, and Canada.

United States' Sentencing Memorandum - 5
*U.S. v. Campbell*, CR17-025JCC

maximize his customer reviews on Silk Road, all to grow his illegal business:

> **Date:** 2013-02-27 15:58:51    **From:** asianboy      **To:** PTandRnR
> **Subject:** subject
> **Message:** hey man. do u have any free benzos samples available?
>
> ---
>
> **Date:** 2013-02-27 19:40:24    **From:** PTandRnR      **To:** asianboy
> **Subject:** ?
> **Message:** send me your info
>
> **Date:** 2013-04-19 17:17:03    **From:** PTandRnR      **To:** aufish02
> **Subject:** really quick
> **Message:** We are trying to build up our fan base so if you decide to become a fan you will receive an extra-
> Just let us know that you did
> We appreciate your interest in our products
> PT & RnR
>
> **Date:** 2013-02-28 18:53:32    **From:** PTandRnR      **To:** Nzyme
> **Subject:** about the 20
> **Message:** Im sorry but I cannot give you 20 samples at the most I can try to send you 2. I don't know if you've noticed it or not but I have listed that I only ship in the USA but I will try to send to you if you'd like
> Regards
> Pt & RnR

*Id.* at 001189, 1190, 1410. In fact, on his vendor page, Campbell promised "an extra" if a customer became his "fan":

> With every order made if you become a fan you will receive an extra (who knows what it could be for the day)
>
> If you are a repeat customer you already know the deal

Exhibit 2.

Similarly, Campbell coerced customers to optimize the "rating" he and his close associates received on Silk Road; thus, improving his marketability to other actual and potential drug customers. As one example, Campbell brokered a deal between one of his favored fellow vendors and a dissatisfied customer over a MDMA (ecstasy) purchase. Campbell offered the Silk Road customer, "Annie5," free MDMA (ecstasy) or marijuana to change highly negative feedback posted on Silk Road:

> **Date:** 2013-07-18 22:12:34    **From:** PTandRnR      **To:** Annie5
> **Subject:** Free Molly or Weed - You In?
> **Message:** Good Day,
> My name is PT from PTandRnR and no I am not here to solicit anything to you – nothing but a resolution that is. A resolution you might ask? Yes! Now you may not have bought anything from me directly but I am working with a fellow vendor friend at HumboltGreenGarden and we are trying to mentor him to get his stats back on track - Hence you are apart of this equation...
>      …

United States' Sentencing Memorandum - 6
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*** this is where the free weed or molly comes in at*** ( I left this in there for the skimmers :-))
To conclude we have a quick question- do you smoke weed? (if yes) Would some weed help to make your experience better and make this go away? We ask because we are willing to offer you a couple of grams of weed in exchange for a 5/5 rate change. If you don't smoke weed then maybe a gram of molly will do? – a new batch of course(again things happen that are not always intentional -so thank you for calling it to my attention). So that's the offer- It's either one or the other -Talk to me- tell us what it would take to satisfy you enough to make you go back into your feedback and find something good about the experience-(That something could be like package arrived fast, just good communication or shit just leave it blank it doesn't matter we just need you to change your number status from a 1 or 3 to a 5.
Sooooo… do we have a deal? if we do when you reply to this message include you shipping info and we will get that right out to you – But First you have to tell us that you changed your rating and then we verify it once this is done then you are good to go and your package will be on the next thing smoking- let's make it happen
***if you are wondering how can you go in and change your feedback***
After you open up your page
Go into your account (you will see escrow usd escrow btc & available in the center)
Look to the right of that page you will see the account links box
Click the 2nd one from the top where it says view feedback then go in and edit your message to have a 5/5 rating
Thank you so much for your time and consideration
We appreciate your cooperation in advance
We are looking forward to your response
Sincerely,
PT
PSSSST: By the way have you seen the btc rates that HGG's giving to people? IT'S INSANE you may have to wait to get them but it's worth not giving away all of your money for a fee if you've got the time

Exhibit 3 at 001178. Indeed, after some negotiation, vouching, and reference to his own glowing customer reviews and reputation on Silk Road, Campbell persuaded "Annie5" to change her feedback rating – from 1 to 5 out of 5 (the highest rating) – promising a full Bitcoin refund. *Id.* at 001178-81. Campbell negotiated a similar deal on his own behalf, convincing a dissatisfied customer in Australia, "Augusto7," to retract his negative feedback in exchange for a full refund. *Id.* at 001192.

One common complaint Campbell initially encountered involved his delivery process. More specifically, Campbell's drugs, sent by U.S. mail, often were arriving crushed. He quelled complaints by replacing damaged products and ultimately concocted new methods to improve his service. For instance, as Campbell described to a customer:

**Date:** 2013-03-09 03:37:44    **From:** bgnarly    **To:** PTandRnR
**Subject:** subject
**Message:** I ordered a sample of pills, I thought, and received an unidentifiable blue powder.....

---

**Date:** 2013-03-09 04:39:39    **From:** PTandRnR    **To:** bgnarly
**Subject:** you arent the only 1
**Message:** Unfortunately the pills that you received couldn't stand up against the crushing power of the mail sorter. So if you resend your information we will resend the samples to you with a newly revised shipping method. We apologize for the inconvenience but as soon as you resend that info to us is as soon as we can get that back out to you.
 Also on a side note both of the pills were blue so what you received is actually both the xanex and noro mixed together we call it "Xanorco" it's still good because it just got smashed but we will resend you the pills so that you can have them as they should be
Thanks for understanding in advance
PT & RnR

United States' Sentencing Memorandum - 7
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*Id.* at 001197; *see also id.* at 001199, 001438.  As the investigation revealed, Campbell's "newly revised shipping method" to address customer complaints, referenced in his above message to customer "bgnarly," involved the use of altered movie DVD cases to protect drugs during shipment.  For example, on August 29, 2013, Campbell described to a customer his stealth shipping practice in a message appropriately titled "Stealth":

**Date:** 2013-08-29 17:04:13     **From:** PTandRnR                    **To:** kxb119
**Subject:** Stealth
**Message:** generally with our pkgs the items are placed in dvd covers and sent priority however if your roomate opens the movie then forget it however we could arrange for a different packaging from our norm since yours is a special case depending upon what your interest is in if it is DNP we can place them inside of a vitamin bottle and ship that out to you- it really depends on what you're ordering and how creative we have to get but Im sure we could pull it off

*Id.* at 001379.  Coincidentally, the same day Campbell sent this message to customer "kxb119," another customer "d0xic" (Jordan M.) received his drug order from Campbell in that very manner, *i.e.*, shipped in a DVD case.  As discussed below, that customer, Jordan M., overdosed and later died.

### 2.    *Overdose Death of Jordan M. ("d0xic")*

One of Campbell's Silk Road customers was Jordan M., a young Microsoft employee living in Bellevue, Washington.  Unbeknownst to his friends and family, using the alias "d0xic," he occasionally obtained various drugs on Silk Road, often from Campbell.  Dating back to at least March 2013, Campbell periodically mailed drugs, most often Xanax (alprazolam) and valium, to Jordan M.  Campbell and Jordan M. exchanged over a hundred private messages between March and August 29, 2013.  In their communications, they often discussed Campbell's use of DVD cases to conceal ordered drugs.  For example, Jordan M. often confirmed receipt, telling Campbell about having received "Saint," "Crazy Heart," and "Vanilla Sky," which are all movie titles and presumably refer to the DVD case used to ship drug orders.  *Id.* at 001239, 1245, 1247.

In late August 2013, Jordan M. inquired about purchasing "quality H" (heroin).  Campbell responded affirmatively.  On August 27, he sent Jordan M. a message titled "Food for thought…" offering "china white," a particularly potent type of heroin, at a price of $150 per gram:

United States' Sentencing Memorandum - 8
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**Date:** 2013-08-27 14:09:52    **From:** PTandRnR    **To:** d0xic
**Subject:** Food for thought...
**Message:** I can get you grams of china white for $150

Exhibit 3 at 001248. Jordan M. accepted the offer, and Campbell sent him heroin, along with some Xanax pills. On August 28, Campbell sent Jordan M. a message titled "Your day just got better," which provided the USPS tracking number for a mailed package containing 2 grams of heroin and "50 bars" of Xanax (alprazolam) and confirmed scheduled delivery by noon (12 p.m.) the following day:

**Date:** 2013-08-28 13:34:53    **From:** PTandRnR    **To:** d0xic
**Subject:** Your day just got better
**Message:** Who's Da Man?
by 12:00pm tomorrow afternoon---&gt;>>tracking EU943361479US pkg to include 2 grams dope & 50 bars which puts us at $1,100 (does not include gratuity or interest) we'll leave that up to you

*Id.* at 001249. Campbell quoted a total price of $1,100 and, still more, suggested a gratuity and/or interest for his service.

Campbell, as part of his customer experience, tracked the package and, the next day, on August 29, sent Jordan M. an update about the ordered drugs:

**Date:** 2013-08-29 08:55:27    **From:** PTandRnR    **To:** d0xic
**Subject:** Your day just got better
**Message:** well you got about an hour before it gets there however it has departed the PO (which is always good) as far as the quality is concerned ... all I got to say is you should be good there have been no complaints and a lot of satisfied people. - its powder. And the road was down so I couldn't respond earlier- let me know how you like that

*Id.* Notably, Campbell piqued Jordan M.'s anticipation, stating "all I got to say is you should be good" as "there have been no complaints and a lot of satisfied people."

Jordan M. received Campbell's package, containing the ordered drugs, at about noon, as scheduled. Indeed, according to USPS records, the express mail parcel (tracking no. EU943361479US) was mailed from a Chicago location on August 28, and delivered to Jordan M.'s Bellevue residence at noon on August 29.

Shortly after the delivery, at about 12:29 p.m., Campbell sent Jordan M. a follow-up message asking for a product review and inquiring whether Jordan M. wanted more:

United States' Sentencing Memorandum - 9
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

> **Date:** 2013-08-29 12:29:00   **From:** PTandRnR          **To:** d0xic
> **Subject:** I hope that all is ok
> **Message:** I was just able to see that your pkg has been delivered to you and was curious as to the review- should I be grabbing more of that?-
> ok well cheers
> enjoy

*Id.*  Jordan M. never read that message, sent at 12:29 p.m., which was later discovered as "unread" mail in Jordan M.'s Silk Road inbox.  By then, Jordan M. had already injected .3 g of Campbell's heroin and, by all appearances, quickly became incapacitated.  (As noted below, the baggie containing 1.7 g of heroin, still open, was found on his computer desk, next to a lighter, spoon, and other indicia of recent heroin use.)

When Jordan M. failed to show up at work later that afternoon, coworkers tried to contact him.  A houseguest looked in his bedroom and discovered Jordan M. unconscious in a chair still in front of his computer desk.  His skin was blue and cold to the touch. Emergency personnel responded and transported Jordan M. to the nearby Overlake hospital, where he was diagnosed and treated for severe brain injury due to heroin overdose induced respiratory failure:

**FINAL IMPRESSIONS**

1. **Heroin overdose**
2. Acute respiratory failure
3. Aspiration pneumonia
4. Lactic acidosis
5. Shock circulatory

Campbell, unaware of the tragedy unfolding in Western Washington, continued to message Jordan M. and pester him for payment and feedback:

> **Date:** 2013-08-29 17:27:19   **From:** PTandRnR          **To:** d0xic
> **Subject:** thinking about tomorrow
> **Message:** Listen I have to take care of some things so I would like to ask if you could get those mp's early for me. I need the money to take care of fucking driving tickets and I need to do it before the holiday so tomorrow is it- I hope.

> **Date:** 2013-08-30 05:48:14   **From:** PTandRnR          **To:** d0xic
> **Subject:** where you at bro
> **Message:** We've been looking forward to today we hope that all is okay with you- Honestly your kinda freaking us out because of the excitement for the package and then after you get it we hear nothing from you when usually you're usually like "hey I got my copy of Godsend" and I was thinking of how we're going to do it on the 30th - so we're just checking in we hope that all is okay
> Let us know whats up

United States' Sentencing Memorandum - 10
*U.S. v. Campbell*, CR17-025JCC

*Id.* at 001250.  Jordan M., of course, did not respond to, or ever receive, Campbell's requests.

On August 31, 2013, Jordan M. died at the hospital following the termination of medical care due to no brain activity.  The King County Medical Examiner certified the cause of death as anoxic encephalopathy due to acute combined opiate probable heroin, alprazolam and diazepam intoxication.

A few weeks later, having received no response from Jordan M., Campbell sent him one final message, titled "Pretty Fucked Up":

**Date:** 2013-09-20 21:04:30     **From:** PTandRnR          **To:** d0xic
**Subject:** Pretty Fucked Up
**Message:** You left us hanging bro knowing that we were counting on you- is that what we get for looking out for you?

*Id.*  A plainly angry Campbell rhetorically asked Jordan M., whose death he caused, "is that what we get for looking out for you?"

### 3.     Investigation

On August 29, 2013, as part of the emergency call-out to the overdose, Bellevue police officers and members of the Eastside Narcotics Taskforce also responded to Jordan M.'s residence to conduct an investigation.  Sample photographs from the scene are attached as **Exhibit 4**.  On the floor where Jordan M. was found, investigators recovered a used needle and a belt that appeared to have been used as a tourniquet.



Investigators found an open bag of heroin, pills, a spoon with traces of narcotics, a lighter, Q-tips, and other indicia of recent drug use, as well as mail packaging material, on the desk

where Jordan M. was found seated.  A photograph of the desk area:



*Id.*  Furthermore, Jordan M.'s computer, also located on the desk, was powered on and logged into Silk Road under his account ("d0xic").  The account message page was open and revealed various recent communications with Silk Road user "PTandRnR" (Campbell). A photograph of the computer screen:



*Id.*  Investigators noted the recent incoming message title "Your day just got better," which included unread mail.

United States' Sentencing Memorandum - 12
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Investigators also recovered a USPS express envelope and a DVD case for the movie "Godsend" near Jordan M.'s computer desk. The DVD case had the plastic spindle removed, leaving a void, so that it could serve as a box for shipping drugs.[5] No actual "Godsend" DVD was in the residence.

The USPS express envelope bore an express parcel label with shipping no. EU943361479US – *i.e.*, the package sent by Campbell. The package was addressed to Jordan M. at his Bellevue address, and listed "Boomerang Resale, 47 W. Polk St. Chicago IL 60605." USPS records confirmed that the package was mailed the prior afternoon from a USPS facility in Chicago (notably, less than 3 miles from Campbell's residence) and received by Jordan M. at about noon on August 29, 2013. Postal inspectors later identified numerous similar USPS parcels sent from the same (fake) Chicago address, to Jordan M. and others. Some packages were paid for using prepaid cards associated to Campbell.

As noted above, Silk Road was taken down in October 2013, as part of a federal investigation. Campbell, nevertheless, continued to sell drugs, including to his Silk Road clientele.

Through the investigation, detectives identified and contacted another former Silk Road customer of PTandRnR (Campbell), a Colorado resident, who had used the alias "jeblsandpiper." In late April 2014, this individual, at investigators' request, contacted Campbell and ordered 120 Xanax pills, which Campbell agreed to provide. On May 2, 2014, postal inspectors in Denver intercepted that parcel, sent from Chicago, using return address of "47 W. Polk, Chicago, IL 60605." Inside, investigators recovered 120 Xanax pills concealed inside a DVD case. Further, the case was submitted for analysis and found to contain Campbell's fingerprint.

### 4. *Search of Residence and Arrest*

On May 15, 2014, state and federal authorities executed a federal search warrant on Campbell's residence, in Chicago. In the basement of the multi-level house, investigators

---

[5] A fingerprint on the "Godsend" DVD box was later analyzed and determined to belong to Campbell.

United States' Sentencing Memorandum - 13
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

found evidence of an ongoing drug distribution operation, to include marijuana grow equipment, documents/notes related to drug dealing, digital scales, razors, baggies, a heat sealer, and a small amount of drugs (marijuana, steroids, various unidentified pills). Investigators also found computers, numerous empty DVD cases, and U.S. Postal shipping materials, along with various references to the username, "PTandRnR."

Later the same day, Campbell was arrested by a U.S. Postal Inspector. As discussed below, he was charged in Cook County Circuit Court for the possession of various drugs found in his residence.

The various computers and electronic devices seized from Campbell's residence were submitted to the U.S. Postal Inspection Service (USPIS) laboratory for forensic analysis. Analysts waded through an immense amount digital information and located a wealth of evidence confirming Campbell's use of the moniker "PTandRnR" to sell and distribute various drugs. For instance, among other things, analysts recovered draft versions of material Campbell posted to his Silk Road vendor page.

**B.    State Prosecution**

While the follow-up federal investigation continued to unfold, Campbell faced state charges in Cook County Circuit Court based on the various drugs and paraphernalia recovered from his Chicago residence. Campbell, who remained in the community on bond, pled guilty to possession of 3,4 Methylenedioxy-N-Benzylcathinone, a controlled substance. In August 2015, he was sentenced to two years of probation. PSR ¶ 39.

**C.    Procedural History & Plea Agreement**

Upon completion of the state case, the United States contacted Campbell, initially through counsel and then directly, regarding the looming federal charges. In January 2016, he ultimately engaged the Federal Public Defender's Office to represent him with respect to this matter.[6]

---

[6] After multiple attempted contacts, Campbell's defense attorney in the state case informed the government that he did not and would not represent Campbell with respect to the federal investigation. Thus, on January 4, 2016, a target letter

United States' Sentencing Memorandum - 14
*U.S. v. Campbell*, CR17-025JCC

On February 3, 2017, Campbell made his initial appearance in this District and entered a guilty plea, pursuant to a plea agreement, to a single count of *Distribution of Controlled Substances*, relating to his delivery of heroin to Jordan M. Dkt. #9 ("Plea Agreement").

In the Plea Agreement, the parties entered into certain stipulations. Notably, the United States agreed not to charge the "death or serious bodily injury results" penalty enhancement ("death results" enhancement), under 21 U.S.C. § 841(b), which carries a mandatory sentence of no less than 20 years and up to life. *Id.* at ¶ 7.

The parties also stipulated to certain offense level enhancements, such as a 2-level increase for use of a mass-marketing or interactive computer service, under USSG § 2D1.1(b)(7). *Id.* at ¶ 12. Moreover, the United States agreed to recommend a custodial sentence of no more than 120 months (or, 10 years). *Id.* at ¶ 14.

The Agreement also acknowledged that the Court is free to reject the parties' recommendations, to apply additional downward or upward adjustments in determining Defendant's Sentencing Guidelines range, and to impose any sentence authorized by law.

The Plea Agreement also contained a limited waiver of appeal. *Id.* at ¶ 20. Assuming the Court imposes a term of incarceration of no more than 120 months, the United States requests that the Court advise Defendant appropriately regarding his remaining appellate rights, following imposition of sentence.

## III.   GUIDELINES CALCULATION

The United States concurs with the Probation Office's calculation of the advisory Guideline range.

### A.   Guidelines Range

Campbell has a modest criminal history that includes multiple prior arrests and convictions for drug-related offenses, including a delivery conviction and 6-year sentence.

---

was sent directly to Campbell, requesting that his attorney contact this office and further providing contact information for the Federal Public Defender's office in Seattle.

United States' Sentencing Memorandum - 15
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

PSR ¶¶ 36-39.  Excluding, as the Probation Office recommends, his 2014 drug possession conviction, Campbell has 3 criminal history points and thus falls in Criminal History Category (CHC) II.

Assuming that the Court finds that the defendant has sufficiently accepted responsibility at the time of sentencing, the government agrees with the Probation Office and calculates Campbell's Total Offense Level (TOL) to be 42, calculated as follows:

| | | |
|---|---|---|
| Base Offense Level | 43 | USSG § 2D1.1(a)(1) |
| Mass-Marketing Means | +2 | USSG § 2D1.1(b)(7) |
| Acceptance | -3 | USSG § 3E1.1(a) & (b) |
| **TOL** | **42** | |

CHC II and TOL 42 results in an advisory range of imprisonment is *240 months to life*.  Given the statutory maximum, the defendant's advisory Guideline range is 240 months (or, 20 years).

**B.    Possible Defense Objection**

The defense, in late-filed objections, appears to take issue with the base offense level, arguing now that Campbell's drugs possibly did not cause Jordan M.'s death.  This position is unfortunate, as it not only belies the evidence but also somewhat diminishes the defendant's degree of acceptance and contrition.  The United States will file a more substantive response, if necessary, upon review of the defense's sentencing material.

In short, the evidence presented, by any standard, establishes that Jordan M.'s severe bodily injury and ultimate death directly resulted from Campbell.  The instant case is as close to a "needle-in-the-arm" case as there could be.  Jordan M., by all appearances, injected heroin and immediately lost consciousness.  The used needle and looped belt (used to inject the heroin) fell to the floor next to him.  The spoon, lighter, and baggie of 1.7 g of heroin, which was still open, sat on the desk in front of him.  Campbell's mail package, originally containing 2 g of heroin and Xanax (alprazolam), arrived around 12 p.m. and, as the evidence proves, Jordan M. opened it and injected about .3 g, almost certainly before Campbell's follow-up message at 12:29 p.m., asking if Jordan M. wanted more heroin.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Further eliminating any possible doubt, the United States consulted a nationally recognized medical expert in the area of overdose deaths. A copy of the report prepared by Dr. Stacey L. Hail, MD, FACMT, and her curriculum vitae are attached as **Exhibit 5**. Having reviewed the case material, she concluded that the heroin caused Jordan's death:

> **Conclusion: JM suffered respiratory arrest followed by cardiac arrest due to acute heroin intoxication on August 29, 2013. He ultimately died on August 31, 2013 as a result of anoxic encephalopathy and multi-organ failure due to acute heroin intoxication The alprazolam and diazepam do not cause significant respiratory depression. JM would not have died but for the heroin.**

Exhibit 5 at 002351. The Court should so conclude and apply the appropriate base offense level, recognizing the tragic consequence of the criminal conduct at issue.

Campbell, at least to the Probation Office, advanced two bases to question the conclusion that heroin alone caused death. Neither is availing. As a preliminary matter, the defense expert, Norman Thiersch – a medical examiner now in private practice − lacks the proper training and experience (*e.g.*, in toxicology) to render any reliable medical opinion. Notably, he also was provided with only limited information about the investigation.[7]

First, Thiersch highlights what he labels a possible chain-of-custody issue, which is, according to Dr. Hail and common sense, ridiculous. Critical patients transported to emergency rooms are initially assigned aliases with medical record numbers, which is completely understandable given the urgent and time-sensitive circumstances. When time permits, the records are then reconciled. This red herring only highlights Thiersch's limited experience in emergency room procedure.

Second, Thiersch acknowledges that heroin contributed to the overdose death, but further notes that, according to lab analysis, Jordan M.'s alprazolam level was also in the lethal range. The conclusion Thiersch suggests is medically wrong and is addressed by Dr.

---

[7] As a point of emphasis, Thiersch qualifies his opinion: "I am relying on the information that was provided to me at the time of this report. My opinions may change if further information is provided to me for review."

United States' Sentencing Memorandum - 17
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Hail in her report. *See* Exhibit 5 at 2350-51. In short, benzodiazepines, the class of drugs

that includes Xanax (alprazolam), do not cause the type of significant respiratory depression

that Jordan M. experienced, even in large overdoses. Regardless, Campbell also provided

Jordan M. with the Xanax (alprazolam), so this observation about alprazolam levels is

immaterial for sentencing purposes.

In sum, the base offense level of 42 applies because death and serious bodily injury

resulted and Campbell has a prior similar conviction. The United States acknowledges that

the guidelines computation is largely academic, as the government's recommended sentence

falls well below – less than half – the advisory range.[8] That said, the United States firmly

---

[8] Similarly, if the Court were to apply a base offense level strictly based on the drug quantity, the resulting advisory range would be grossly insufficient and understate Campbell's true culpability. Accordingly, an upward variance or departure would be warranted, as recommended by the Sentencing Guidelines. For instance, USSG § 5K2.1 provides that "[I]f death resulted, the court may increase the sentence above the authorized guideline range." That guideline goes on to explain:

> [L]oss of life does not automatically suggest a sentence at or near the statutory maximum. The sentencing judge must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation. Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken. The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other Chapter Two guidelines, already reflects the risk of personal injury. For example, a substantial increase may be appropriate if the death was intended or knowingly risked or if the underlying offense was one for which base offense levels do not reflect an allowance for the risk of personal injury, such as fraud.

Death resulting from criminal conduct constitutes an "encouraged basis for departure." *United States v. Scheetz*, 293 F.3d 175, 190 (4th Cir. 2002). "Under this section of the Guidelines, a district court may depart from an otherwise applicable Guidelines range if the evidence demonstrates, by a preponderance, that the defendant's conduct resulted in death." *United States v. Mousseau*, 517 F.3d 1044, 1049 (8th Cir. 2008). Additionally, Section 5K2.0(a)(1) allows that the Court "may depart from the applicable guideline range if (A) in the case of offenses other than child crimes and sexual offenses, the court finds, pursuant to 18 U.S.C. §3553(b)(1), that there exists an aggravating or mitigating circumstance." Similarly, Section 5K2.1(a)(2)(B) provides that,

> [a] departure may be warranted in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence.

U.S.S.G. §5K2.0(a)(2)(B). Thus, to the extent the Court applies a lesser advisory range computation, the government would then submit that an upward variance or departure is appropriate in the instant case under USSG § 5K2.0 or § 5K2.1, and the 18 U.S.C. § 3553(a) factors.

United States' Sentencing Memorandum - 18
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 believes that the material before the Court is more than sufficient for the Court to reach the

2 conclusion recommended by the Probation Office.[9]

### IV.  RECOMMENDATION AND JUSTIFICATION

4 The government respectfully recommends a custodial sentence of **96 months**, to be

5 followed by three (3) years of supervised release, subject to the recommended standard and

6 special conditions.  The government submits that this sentence is warranted by, and

7 sufficient but not greater than necessary in light of the United States Sentencing Guidelines

8 ("USSG") as well as the factors set forth in 18 U.S.C. § 3553(a) for the reasons set forth

9 below.

### A.    18 U.S.C. § 3553(a) Factors

11 As the Ninth Circuit and the Supreme Court have made clear, the sentencing

12 guidelines are "the 'starting point and the initial benchmark' . . . and are to be kept in mind

13 throughout the process."  *United States v. Carty*, 520 F.3d 984, 996 (9th Cir. 2008) (internal

14 citations omitted).  Title 18, United States Code, Section 3553(a), sets forth factors for the

15 Court to consider alongside the advisory guideline range.  The United States submits that

16 the recommended sentence is appropriate particularly in light of "the nature and

17 circumstances of the offense," "the history and characteristics of the defendant," and the

18 need for the sentence "to reflect the seriousness of the offense, to promote respect for the

19 law, and to provide just punishment for the offense," and "to afford adequate deterrence to

20 criminal conduct."  18 U.S.C. §§ 3553(a)(1), (a)(2)(A), and (a)(2)(B).

21 Here, the nature and circumstances of the offense are egregious.  It involves the use

22 of the Internet and the growing trend of Dark Web criminal marketplaces to mass market

23 illegal drugs.  Campbell employed business principles to manage what amounted to an

24 online storefront to broadly advertise his illicit wares and indiscriminately disseminate them

---

[9] Furthermore, Campbell arguably otherwise qualifies as a Career Offender under USSG § 4B1.1, because the instant conviction is a felony controlled substance offense, which follows at least two prior felony convictions for a controlled substance offense.  If applicable, his guideline range computation would begin with a base offense level 32 and CHC of VI.  See USSG § 4B1.1(b).  Applying the same adjustments would equate in a TOL 31, resulting in an advisory range of 188-235 months.

to customers across the United States and abroad. Thus, this case presents circumstances far more aggravating than the dealer selling drugs in an alley, in a parking lot, or on a street corner. By comparison, Campbell targeted a near-limitless customer base, all while insulating himself through the anonymity offered by Silk Road and Bitcoin currency. The extremely troubling nature of such conduct was thoroughly explored in the prosecution of Ross Ulbrecht, Silk Road's mastermind. As discussed above, the Honorable Katherine Forrest of the Southern District of New York sentenced Ulbrecht to life in prison. While Campbell bears no resemblance to Ulbrecht, who personally reaped millions of dollars from his venture, Ulbrecht's culpability was largely a combination of Silk Road users' individual criminal conduct. Indeed, the United States' sentencing memorandum filed in *United States v. Ulbrecht*, CR14-68KBF, recounted six overdose deaths resulting from drugs disseminated over Silk Road. Notably, the first example described Campbell and his customer, Jordan M. An excerpt from that sentencing memorandum is attached as **Exhibit 6**. In short, the sophisticated nature of the drug trafficking at issue distinguishes this case from run-of-the-mill cases and calls for a sentence of particular significance.

Most significantly, however, this offense involves the entirely foreseeable worst-case scenario: the overdose death of a young man, Jordan M. Campbell comes before the Court having delivered a fatal dose of heroin to a young, bright Microsoft employee struggling with the same issue that grips an ever-growing number of people in communities across this country. While Campbell never intended to kill Jordan M., he, like other heroin distributors, well know the potential lethal consequences their customers face with every injection. As he raked in the money, Campbell either chose to ignore the incredible danger posed by his criminal conduct or simply did not care. Either way, this obvious and immense risk of tragedy became reality when Campbell offered and then delivered "white china" heroin to Jordan M. in August 2013. Like a defendant who recklessly and indifferently fires a gun into a crowd, he owns responsibility for the foreseeable outcome of his criminal behavior.

United States' Sentencing Memorandum - 20
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

While, as discussed below, Jordan M.'s family has provided a glimpse into the devastation Campbell has wrought, we will never hear from Jordan M. about his goals or his dreams, or the opportunities that now have been deprived of him. Jordan M. came from a tight-knit family from a small town on the East Coast. Through hard work, he achieved a position at Microsoft, a global leader in the technology industry. Unbeknownst to his family and even his close friends, Jordan M. also struggled with substance abuse. It appears, through his communications on Silk Road, that he, like far too many others, used less potent drugs and graduated to heroin. Indeed, in August 2013, Jordan M. inquired of his regular drug supplier, Campbell, who happily obliged, offering "white china" heroin. Campbell then mailed him the dose that took Jordan M.'s life. Simply put, Campbell knew what might happen when he sold heroin to Jordan M. Sadly, whether blinded by the easy money or callously indifferent, Campbell was not deterred. The government's recommended sentence would hold him accountable for his crime and its consequences.

Moreover, a death is only one part of the devastation caused by heroin as those who choose to sell it destroy communities, tear apart families, and taint the lives of so many others as a direct and foreseeable consequence. This case illustrates precisely how drug dealers indiscriminately distribute their poison, selling to customers without any regard for the risk and potential anguish they are inflicting. Drugs such as heroin, in particular, destroy users and, with each hit, set the hooks of addiction ever deeper. Still, the real cost is born by the user's parents, friends, and, in many cases, children.[10]

The full impact of Campbell's crime extends deep and remains lasting. Jordan M., after all, is not the only victim of Campbell's criminal conduct. He left behind grieving family members, to include a mother and three younger siblings who all abruptly lost their son and brother. The words of Jordan M.'s mother, K.R., are heart-wrenching and encapsulate the unspeakable pain Campbell caused. Even years later, K.R.'s suffering is apparent and ongoing. Her full letter to the Probation Office is set forth in the Presentence

---

[10] To be clear, Jordan M., unlike other users, did not have children.

United States' Sentencing Memorandum - 21
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Report and relates, in part:

> *I will never see my son marry have children or ever call me a Mama bear again*
>
> *I will never feel his arms around me or his his infectious chuckle or marvel at his incredible  stories*
>
> *A light forever went out in my life*
>
> *Since then my grief  yielded to a massive hemorrhagic stroke*
>
> *I survived  and am able to compose this email*
>
> *But our lives are forever changed by a man who sought to profit  from another's vulnerability*

PSR ¶ 22.  While incarceration will not mend all wounds, nor bring back their son and brother, it will bring Jordan M. some justice, hopefully offer his suffering family some closure and peace, and deter other potential opiate dealers from recklessly peddling in the fates of others.

The government's recommendation is further driven by the seriousness of the offense, the need to deter others, and the need to impose just punishment.  Indeed, by disseminating opiates, specifically, Campbell in essence was trafficking in, and profiting from, addiction and, in doing so, played an aggravated role in a significant, and ever growing, problem in Washington State and around the nation.  It is beyond dispute that opiate abuse is a scourge on communities throughout this country, one that crosses all socioeconomic classes.  Overdoses are steeply increasing.  According to the December 11, 2016, *Washington Post* editorial, "The Great Opioid Epidemic":

> An all-time record 52,404 Americans died from drug overdoses in 2015, according to data released Thursday [December 8] by the Centers for Disease Control and Prevention.  Once rare, these avoidable deaths are now more common than auto-accident fatalities or gun-inflicted homicides and suicides. Some 80 percent of the drug-related deaths were due to the misuse of opioids, a

United States' Sentencing Memorandum - 22
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

category that includes not only illicit substances such as heroin and synthetic fentanyl but also legal pain medications. . . .[11]

This undeniable epidemic has only continued to grow since 2015, which the public readily observes in local and national media reports and, tragically, through anecdotal evidence. In fact, the *New York Times* recently reported that "Drug overdose deaths in 2016 most likely exceeded 59,000, the largest annual jump ever recorded in the United States."[12] According to the June 5, 2017, article, "Drug Deaths in America Are Rising Faster Than Ever," that staggering estimate "is that deaths rose 19 percent over the 52,404 recorded in 2015. And all evidence suggests the problem has continued to worsen in 2017." The trend, illustrated in the chart below, is extremely troubling.



Without any lingering doubt, heroin is the direct cause of this trend and has reached epidemic levels. Nationwide, "death rates for . . . heroin . . . increased by 20.6%."[13]

[11] https://www.washingtonpost.com/opinions/the-great-opioid-epidemic/2016/12/11/77bd8998-be4d-11e6-91ee-1adddfe36cbe_story.html?utm_term=.b7716e569d0a
[12] https://www.nytimes.com/interactive/2017/06/05/upshot/opioid-epidemic-drug-overdose-deaths-are-rising-faster-than-ever.html?emc=eta1&_r=0
[13] Rose A. Rudd et al., *Increases in Drug and Opioid-Involved Overdose Deaths – United States, 2010-2015*, 65 Morbidity and Mortality Weekly Report 1445 (Dec. 30, 2016), which is available at https://www.cdc.gov/mmwr/volumes/65/wr/mm655051e1.htm.

United States' Sentencing Memorandum - 23
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Indeed, in Washington State, "heroin killed 293 people" in 2014, "about twice as many as in 2008."[14]  The severity of the offense necessitates a sentence of some significance, to deter not only Campbell, but also others engaging in, or inclined to engage in, such criminal conduct so detrimental to society.

The Court must also consider the history and characteristics of the defendant.  As noted by the Probation Office, Campbell has already had several encounters with the criminal justice system, to include at least three prior drug convictions dating back to the early 1990s.  PSR ¶ 36-38.  In 1998, he was convicted in state court for delivery of controlled substance and sentenced to six years in prison.  PSR ¶ 37.  He was not deterred, as in 2001, shortly after his release, and apparently while still on probation for his 1998 convictions, Campbell was arrested with drugs (crack cocaine and marijuana) again and ultimately sentenced to another year in jail.  Campbell, of course, again did not draw the intended lesson.  Instead, he graduated to more sophisticated methods – that is, rather than pursuing law-abiding ventures, he chose to improve his craft and, through Silk Road and a little business savvy, increase profit while reducing chance of capture.

The government also recognizes factors weighing in favor of mitigation.  The defense has provided the United States and the Probation Office with mitigation material, which is largely summarized in the Presentence Report.  The United States notes Campbell's turbulent upbringing and military service in particular.  Moreover, although he willingly supplied it, Campbell did not regularly distribute heroin, but focused more heavily on MDMA (ecstasy), marijuana, steroids, and generic drugs, such as Xanax (alprazolam), valium, and Viagra.  Finally, since his initial arrest, and specifically since being represented in the recent criminal cases, Campbell obtained employment at the Veteran's Administration (VA) and has undergone treatment.  These are positive steps taken and,

---

[14] Press Release, Washington State Department of Health, Opioid Epidemic Continues in Washington (Nov. 17, 2015), which is available at http://www.doh.wa.gov/Newsroom/2015NewsReleases/15188OpioidOverdoseDeathsNewsRelease.

United States' Sentencing Memorandum - 24
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

giving him the benefit of the doubt, shows that he can pursue a pro-social, law-abiding life. That said, such recent behavior while significant charges loomed stands in stark contrast to his decision-making following each of his prior convictions and his profiteering cloaked on the Dark Web.

In fashioning a sentence, the Court also must consider the "need to avoid unwarranted sentence disparities" among "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In short, the government is unaware of any defendant that is similarly situated to Campbell. As discussed above, Campbell's use of Silk Road and mass-marketing is severely aggravating and distinguishes this case from hand-to-hand street dealers. For instance, Judge Settle recently imposed 42-month sentences for three defendants, themselves addicts and heavy drug users supporting their own habits, who gave a fatal dose to a friend on a local tribal reservation. None had serious criminal history; some had none. That type of case, where the defendant could just as easily have been the overdose victim, stands in stark contrast to Campbell's, where he essentially operated a for-profit web-based business broadly marketing and indiscriminately peddling drugs. Moreover, unlike those defendants, Campbell has multiple drug convictions and was plainly selling dope, on the Dark Web, for profit.

To be clear, the United States' recommendation, while higher than that of the Probation Office, remains below – and in some cases well below – the sentences imposed in overdose death cases in other federal districts around the country. Below is a chart of some sentences in cases involving overdose deaths:

| Defendant Name | District | Case Number | Plea/Trial | Sentence |
|---|---|---|---|---|
| Levi Lawrence Morefield | E.D. Washington | CR13-2113 | plea | 180 mos. |
| Jacob Alan Seiger | E.D. Washington | CR14-2044 | plea | 156 mos. |
| David Bollinger | E.D. Missouri | CR16-30 | plea | 130 mos. |
| Ronnie A. Brickhouse | E.D. Virginia | CR14-0060 | plea | 360 mos. |
| Joel Borjas-Hernandez | S.D. West Virginia | CR09-163 | plea | 292 mos. |
| Paul Volkman | S.D. Ohio | CR07-0060 | trial | Life imprisonment |

United States' Sentencing Memorandum - 25
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| | | | | |
|---|---|---|---|---|
| Denise Huffman | S.D. Ohio | CR07-0060 | plea | 152 mos. |
| Alice Huffman Ball | S.D. Ohio | CR07-0060 | plea | 60 mos. |
| | | | | |
| Christopher Green | E.D. Missouri | CR15-238 | plea | 120 mos. |
| | | | | |
| Steven Robinson | E.D. Missouri | CR15-216 | plea | 144 mos. |
| Hali Wilson | E.D. Missouri | CR15-216 | plea | 84 mos. |
| Kyle Turner | E.D. Missouri | CR15-216 | plea | 84 mos. |
| | | | | |
| Jerry Harvey | E.D. Missouri | CR15-209 | plea | 240 mos. |
| | | | | |
| Thomas Sweger | M.D. Pennsylvania | CR07-103 | plea | 132 mos. |
| John Doe (Aka Cesar Hernandez) | M.D. Pennsylvania | CR07-103 | plea | 180 mos. |
| Enrique Ramos-Sanchez | M.D. Pennsylvania | CR07-103 | plea | 210 mos. |
| Felix Ortiz-Garcia | M.D. Pennsylvania | CR07-103 | plea | 151 mos. |
| Eduardo Berrios | M.D. Pennsylvania | CR07-103 | plea | 21 mos. |
| | | | | |
| Walter Lee Johnson | W.D. Michigan | CR11-182 | plea | 240 mos. |
| Eric David Taylor | W.D. Michigan | CR11-182 | plea | 180 mos. |
| | | | | |
| Mara Lee Greenough | W.D. Texas | CR09-639 | plea | 105 mos. |
| | | | | |
| Edward Rodriguez | M.D. Florida | CR99-174 | plea | 240 mos. |
| Samuel Velez-Gomez | M.D. Florida | CR99-174 | plea | 160 mos. |
| | | | | |
| Casey Marie Ward | W.D. Washington | CR16-5540 | plea | 42 mos. |
| Edward Perry Foster | W.D. Washington | CR16-5540 | plea | 42 mos. |
| Hugh Brown | W.D. Washington | CR16-5540 | plea | 42 mos. |

Each case poses its own unique circumstances and the government offers this information merely to emphasize that sentencing disparity can only support the government's recommendation and counter that of the defense.[15]

Finally, for the reasons set forth, a sentence of some significance is necessary in order to reflect the seriousness of the offense, to protect the public, to provide just punishment, and to promote respect for the law. A prior six-year sentence for drug distribution proved an inadequate deterrent. Now, a young man is dead. Accordingly, the circumstances call for a sentence greater than six years, as both necessary and appropriate. That said, as noted, the United States recognizes factors that weigh in mitigation and agrees that a sentence below the advisory guideline range is appropriate under the circumstances.

---

[15] Given that parties do not have access to the presentence report and other material information related to other cases, the government believes that sentence disparity offers only limited value across separate cases.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

It is truly unfortunate that the defendant elected to return to distributing narcotics to supplement his lifestyle. In doing so, he indifferently wagered the lives of strangers, as he anonymously hid behind his Silk Road alias, "PTandRnR." Nevertheless, the United States recognizes mitigating factors and acknowledges that a customer's overdose death was not intended – although entirely foreseeable. The guidelines range and the possible "death results" enhancement, under 21 U.S.C. § 841(b), are simply too harsh under these circumstances. Rather, through a negotiated resolution, the United States is pursuing what it believes to be a just result, taking the 18 U.S.C. § 3553(a) factors into full account. It is in all parties' interest – the defendant's, society's, and the government's – that Campbell sincerely learn his lesson and finally cease exploiting others and violating the law, particularly for personal gain. It is the United States' sincere hope that Campbell's efforts while facing this looming federal prosecution are sincere. The defendant must understand that future criminal activity will be treated very differently and met with substantially lengthier potential punishment. After serving his sentence, Campbell will get yet another chance – his third or perhaps fourth – to move forward as a productive, law-abiding member of society. Jordan M. will never get that opportunity.

**B.      Fines, Forfeiture, and Restitution**

The United States concurs in the recommendation of the Probation Office that the fine be waived based on the defendant's apparent inability to pay. However, the defendant is responsible for the mandatory Special Assessment of $100. There is no additional forfeiture.

//

//

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# V.    CONCLUSION

For the reasons set forth above, the United States respectfully recommends that the Court sentence the defendant, Kevin Campbell, to a custodial term of 96 months, to be followed by three years of supervised release.

Dated this 1st day of August, 2017.

Respectfully submitted,

ANNETTE L. HAYES
United States Attorney

*/s/ Steven T. Masada*
STEVEN T. MASADA
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington  98101
Phone: 206-553-4282
E-mail: steven.masada@usdoj.gov

United States' Sentencing Memorandum - 28
*U.S. v. Campbell*, CR17-025JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**Table of Exhibits**

| Exhibit | Description |
|---------|-------------|
| 1 | Campbell's LinkedIn page |
| 2 | Campbell's vendor site on Silk Road |
| 3 | Campbell's direct message communications on Silk Road (FILED UNDER SEAL) |
| 4 | Sample photographs of overdose crime scene |
| 5 | Report & curriculum vitae of Dr. Stacey Hail, MD, FACMT |
| 6 | United States' sentencing memorandum, *United States v. Ross Ulbrecht*, CR14-68KBF (S.D.N.Y.), Dkt. #256 (excerpt) |

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 1, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorney(s) of record for the defendant(s).

*s/ Alissa Harris*
ALISSA HARRIS
Paralegal Specialist
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: (206) 553-4439
Fax: (206) 553-4440
Email: Alissa.Harris@usdoj.gov

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970